# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **MEDURI FARMS, INC.**, an Oregon corporation, | Case No. 3:17-cv-906-SI |
| Plaintiff, | **OPINION AND ORDER** |
| v. | |
| **DUTCHTECSOURCE B.V.**, a corporation of the Netherlands, | |
| Defendant. | |

Jeffrey M. Edelson and Dallas S. DeLuca, MARKOWITZ HERBOLD PC, 1211 SW Fifth Avenue, Portland OR 97204. Of Attorneys for Plaintiff.

M. Christie Helmer, John F. Neupert, and Sanja Muranovic, MILLER NASH GRAHAM & DUNN LLP, 3400 U.S. Bancorp Tower, 111 SW Fifth Avenue, Portland, OR 97204. Of Attorneys for Defendant.

**Michael H. Simon, District Judge.**

On April 14, 2017, Plaintiff Meduri Farms, Inc. ("Meduri") filed a lawsuit in the Circuit Court of the State of Oregon for Polk County against Defendant DutchTecSource B.V. ("DTS"). On May 17, 2017, Meduri filed its First Amended Complaint ("FAC"). Meduri alleges two claims: breach of the implied warranty of fitness for a particular purpose and breach of contract. DTS timely removed the case to federal court. On July 10, 2017, DTS filed a request for arbitration with the International Court of Arbitration at the International Chamber of Commerce ("ICC"), seeking arbitration in Amsterdam. The arbitration has since been set in Vienna.

Before the Court are several motions. DTS moves to refer the parties to the arbitration before the ICC and stay these proceedings. DTS argues that the operative contract between DTS and Meduri contains a mandatory arbitration clause, under which the parties agreed to arbitrate any dispute pursuant to ICC rules. Also before the Court is Meduri's motion for preliminary injunction, seeking to enjoin DTS from continuing to pursue arbitration against Meduri at the ICC. Meduri argues that the purported contract alleged by DTS in its motion was not the actual contract entered into between Meduri and DTS and that the operative and enforceable contract between the parties does not contain an arbitration clause.

The parties' procedural disagreement over the proper forum in which to resolve their substantive dispute raises a question about what constitutes their actual contract. The parties agree that they are both merchants and their contract involved the sale of goods. Although the parties disagree over which law governs the resolution of their procedural dispute, that disagreement ultimately does not matter. Under both the law urged by DTS, the law of the state of Oregon, which has codified the Uniform Commercial Code ("UCC"), and the law urged by Meduri, the United Nations Convention on the International Sale of Goods ("CISG"), the result is the same. Under both of these sets of law, a contract between merchants for the sale of goods need not contain all of the material terms and need only contain a few essential terms. Indeed, merchants, assumed to be sophisticated business parties, do not need to memorialize in their contracts all of the details of their transaction, such as technical specifications, delivery dates, warranties, and other terms. In this case, the Court concludes that the operative agreement among the parties does not contain a mandatory arbitration clause; nor does it clearly and unmistakably delegate the question of arbitrability to the ICC. Accordingly, as more fully discussed below, the Court grants Meduri's motion for preliminary injunction, enjoins DTS from continuing to pursue

arbitration against Meduri at the ICC, and denies DTS's motion to refer this case to the ICC and stay further proceedings in this Court.

## STANDARDS

A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Defense Council, Inc.*, 555 U.S. 7, 22 (2008). A plaintiff seeking a preliminary injunction generally must show that: (1) he or she is likely to succeed on the merits; (2) he or she is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his or her favor; and (4) that an injunction is in the public interest. *Id.* at 20 (rejecting the Ninth Circuit's earlier rule that the mere "possibility" of irreparable harm, as opposed to its likelihood, was sufficient to justify a preliminary injunction).

"A district court may enjoin [a party from pursuing] arbitration proceedings that are not governed by a valid and binding arbitration agreement." *Ingram Micro Inc. v. Signeo Int'l, Ltd.*, 2014 WL 3721197, at *2 (C.D. Cal. July 22, 2014). An injunction to enjoin a party from pursuing arbitration proceedings may be granted if the moving party meets the requirements for a preliminary injunction. *See Textile Unlimited, Inc. v. ABMH & Co.*, 240 F.3d 781, 786 (9th Cir. 2001) (applying the then-existing preliminary injunction requirements in affirming the district court's injunction enjoining the defendant from continuing to pursue arbitration).

## BACKGROUND

### A. The Parties

Meduri is an Oregon company that produces dried fruit products, including dried blueberries. Meduri historically processed blueberries, primarily by drying and infusing, using Meduri's proprietary equipment. In 2015, Meduri considered purchasing a new processing system that would improve efficiency and capacity. Meduri approached DTS, among others.

DTS is a Dutch company that designs, engineers, manufactures, and sells food processing equipment used in various food industries.

**B. Processing System Purchase**

In the summer of 2015, DTS and Meduri first discussed the possibility of DTS selling to Meduri a customized food processing system. On July 15, 2015, DTS sent Meduri a document, identified as VF150293 ("293"), offering such a system. ECF 21-1. This document included technical information, explaining that the system would process 10,000 pounds of blueberries per hour and other technical details, a diagram, an estimated price, a list of items for which Meduri would be responsible, and a comment that specific drawings would be forthcoming. There was no mention of arbitration or even that the "Orgalime Conditions" would apply.[1]

On July 24, 2015, Meduri responded with a "Letter of Intent." ECF 21-2. This letter expressed Meduri's intent to purchase a system from DTS, but noted that the parties are "still in the early stages of this process and there is a lot to do." Meduri requested from DTS a new design that would include two units that could each process 5,000 pounds of blueberries per hour and would each have a defroster, three augers, and bypass flumes for the first and second augers; a new auger to feed the defrosters; a chiller system on the back end; a new price quotation; a

---

[1] Organisme de Liaison des Industries Métalliques Européennes ("Orgalime"), known in English as the European Engineering Industries Association, is a European organization representing the interests of European businesses in mechanical, electrical, and other similar industries. *See About Us*, ORGALIME, http://www.orgalime.org/page/about-us (last visited December 5, 2017). Among other things, Orgalime publishes general terms and conditions that industry members commonly incorporate into their agreements when doing business internationally. The Orgalime Conditions are "contractual provisions that address matters such as risk of loss, *force majeure*, title, and timing of delivery and payment." *Al Rushaid v. Nat'l Oilwell Varco, Inc.*, 757 F.3d 416, 421 (5th Cir. 2014). "As is common in the commercial context, the [Orgalime Conditions are] designed to serve as a foundational 'set of general conditions for the supply of products, which could be used worldwide.' On top of this foundation, parties may add or modify terms in order to tailor the contract to their specific needs." *Id*. (footnote omitted).

video, and a new orientation. Meduri also invited a representative from DTS to come to Oregon in September "to celebrate the signing of the contract for this project!" *Id.*

On August 24, 2015, DTS sent a detailed cover letter and another document, identified as VF150332 ("332"). ECF 11-1. The cover letter explained many aspects of the new proposed processing system, including describing: that two units would each process 5,000 pounds per hour; the tank, pump, and defrosting system; the auger and infusion system; the bypass flume and dewatering system; and the sugar mixing system. *Id.* at 1-4. The cover letter also described the goals of the system, including details regarding electrical power consumption, required manpower, lack of sugar water waste, and why the end product would be "high quality." *Id.* at 4-5.

The 332 document described two units, each with the capacity to process 5,000 pounds of fruit per hour. The 332 document was more detailed than the 293 document. The 332 document included details for each element of the quotation. For example, in the 332 document, Section A, Project Engineering, lists five sub-items describing what constitutes "project engineering." *Id.* at 7. Also in the 332 document, Section B, Collecting Auger 0500 x 6000 with CIP System, provides specifications for diameter, length, section sizes, pitch, and the like. Each of the sections has individual section prices. *Id.* at 7-8. The detailed sections in the 332 document (Sections A through N), with specifications and descriptions, comprise 23 pages. *Id.* at 7-30. After these pages is a sheet that lists three items that Meduri will provide and six items that will not be within the scope of what DTS will provide. *Id.* at 31. The next page is a "Price Overview" that lists the items from Sections A through N with a short description, unit price, total line item price, and grand total. *Id.* at 32. The last page of the 332 document states: (1) a delivery in April 2016; (2) payment terms of 10 percent upon order, 40 percent after approval of layout, 40

percent prior to shipment, and 10 percent within 60 days of delivery; and (3) "*Orgalime Conditions are applicable. At request we will send you a copy.*" *Id.* at 33 (emphasis in original). According to DTS, the "Orgalime Conditions" includes a provision requiring arbitration of all disputes through the ICC and a delegation to the ICC to resolve gateway disputes of arbitrability.

On August 28, 2015, DTS sent an email to Meduri attaching a new letter. ECF 21-5. This letter confirms several changes that were discussed among the parties during an August 27, 2015 telephone call. The August 28th letter also changes some of the terms that were previously stated in the 332 document sent on August 24, 2015. For example, the August 28th letter discusses modifying the "infeed" section with an extra feeding line. *Id.* at 2. The letter also includes a more extensive list of items that are not within the scope of DTS's responsibility than was listed in the 332 document. *Id.* at 3. The August 28th letter also includes a warranty provision, which was not included in the 332 document. *Id.* at 4. Finally, the letter changes the delivery month to June 2016. *Id.* In the August 28th letter, DTS also states: *"If we come to an agreement* our engineer will visit you somewhere around the 23rd of September." *Id.* at 2 (emphasis added).

Shortly thereafter, Meduri decided to purchase only one processing unit, rather than two, and Meduri asked DTS for a new price quote. On September 16, 2015, DTS sent Meduri a document identified as VF150355 ("355"). ECF 11-3. The 355 document consists of a single page "Price Overview," similar to the price overview contained in the 332 document. The 355 document lists only the item description, unit price, line item price, and grand total. It does not contain any technical specifications, delivery date, payment terms, warranty information, or statement that the Orgalime Conditions apply. It also makes no reference to incorporating any previously-provided terms, conditions, or descriptions.

On September 19, 2015, Mr. Dominic Meduri sent an email to DTS with the subject line "VF150355 – Meduri Farms." ECF 11-4. In this email Mr. Meduri expresses his excitement about the project and getting DTS's infusion system in place. Mr. Meduri notes that he will "get the 10% deposit upon order to you early next week." *Id.*

On November 12, 2015, Mr. Justin Wakker of DTS sent an email to Mr. Meduri noting that DTS was "way over" the 10 percent deposit previously paid by Meduri and that Mr. Wakker would like to "talk about the way we will setup [*sic*] a payment schedule." ECF 21-7. Mr. Meduri responded that he "was going over the quote and the next round of payments would be coming your way after approval of layout. It would help us if we didn't have to pay the 40% all at once, so we can do another 10% payment after our meeting. How would you like to [*sic*] the payment schedule to look?" DTS then sent invoices to Meduri for the processing system, none of which referenced the Orgalime Conditions. *See* ECF 11-5; 35-1 at 75-80, 82-83, 85-86.[2]

Ultimately, Meduri paid DTS 90 percent of the purchase price for a single processing machine. Meduri alleges in its lawsuit that the system purchased from DTS never worked properly and that Meduri requested DTS to remove the system and pay Meduri what it has already paid plus additional damages. DTS requests that Meduri pay the remaining 10 percent owed on the purchase, which is 296,400 euros.

## C. Auxiliary Pa`rts Purchases

### 1. Test Flume

On November 17, 2015, DTS sent Order Confirmation VK152666 to Meduri, confirming the order of a test flume. ECF 11-6 at 54. This Order Confirmation states that the Orgalime

---

[2] Puzzlingly, the invoices for the processing system all show a DTS reference number of VK152200, which from other DTS invoices in the record would appear to be the reference number for the applicable document or quotation. Neither party, however, submitted to the Court the document identified as VK152200, and it is not in the record.

Conditions are applicable. On November 18, 2015, DTS sent an invoice to Meduri for 50 percent of the test flume. ECF 11-6 at 60. The invoice does not reference the Orgalime Conditions. This invoice was paid. ECF 11-6 at 61.

On November 24, 2015, Meduri sent DTS Meduri's Purchase Order No. CP1152702, confirming the purchase of the test flume. ECF 35-1 at 89. This Purchase Order does not mention the Orgalime Conditions. On March 23, 2016, DTS sent an invoice for the remaining 50 percent owed for the test flume, 30,900 euros. ECF 11-6 at 62. This invoice does not reference the Orgalime Conditions and remains outstanding.

### 2. Clamps

On October 25, 2016, Mr. Marcel van de Pol from DTS sent an email to Meduri's Mike Davis, who works in maintenance purchasing. In the email, DTS's Mr. van de Pol thanks Meduri's Mr. Davis for his inquiry regarding clamps and attaches two documents: a quotation for the clamps and a pdf copy of the Orgalime Conditions. ECF 11-6 at 86-95. The email states, "Attached you will find our quotation and best delivery time. In this quotation our terms and conditions apply. Upon request we will send you a copy of the general supply conditions." *Id.* at 86. The attached quotation, identified as VF160541, does not contain any reference to the Orgalime Conditions.

Mr. Davis promptly responded: "Yes, I need four of these . . ." ECF 11-6 at 96. DTS then sent an order confirmation and invoice to Meduri for the four clamps. ECF 11-6 at 97-98. Neither of these documents from DTS references the Orgalime Conditions. The invoice in the amount of 378 euros for the four clamps remains outstanding.

### 3. Pressure Transmitter

On November 8, 2016, DTS's Mr. van de Pol emailed Meduri's Mr. Davis stating: "Please find attached item number, price and leadtime [for this] pressure transmitter." ECF 11-6

at 63. Attached to this email was two items: a document identified as VF160556 and a pdf of the Orgalime Conditions. Neither the transmittal email nor document VF160556, however, expressly refer to the Orgalime Conditions.

That same day, Mr. Davis responded: "Ok, we need two of these—use our PO M27202." *Id.* at 73. The next day, Ms. Jacqueline Wakker from DTS sent an email to Mr. Davis thanking him for the order, and attaching the order confirmation and another copy of the Orgalime Conditions. Ms. Wakker's email stated: "Attached you will find our order acknowledgement and delivery time. . . . In this order acknowledgement our terms and conditions apply. On request we will send you a copy of the general supply conditions." *Id.* at 75. The email did not reference the Orgalime Conditions or explain what was meant by "our terms and conditions" or "the general supply conditions." The attached order confirmation also did not reference the Orgalime Conditions or explain those referenced terms. *Id.* at 76.

DTS invoiced Meduri for the pressure transmitter. *Id.* at 85. The invoice also did not reference the Orgalime Conditions. This invoice in the amount of 1,137.50 euros remains outstanding.

**DISCUSSION**

DTS argues that Meduri's motion to enjoin DTS from continuing the arbitration before the ICC should be denied both procedurally and on the merits. Procedurally, DTS argues that whether the parties are subject to arbitration is a gateway issue that should be decided by the arbitrator and not the Court. DTS argues, alternatively, that if the Court determines that it should decide this gateway issue, the Court should deny Meduri's motion on the merits because Meduri cannot show that it has a likelihood of success on the merits because Meduri has agreed to a contract that expressly incorporates the Orgalime Conditions, which DTS contends contain a mandatory ICC arbitration clause. DTS further argues that Meduri also cannot show irreparable

harm because the only harm in having to arbitrate as well as litigate is financial. DTS adds that the public interest and the balance of the equities also favor arbitration.

## A. Determining Arbitrability

DTS argues that, when a contract calls for arbitration under ICC rules, the gateway issue of arbitrability is delegated to the arbitrator, citing *Portland General Electric Co. v. Liberty Mutual Ins. Co.*, 862 F.3d 981, 985-86 (9th Cir. 2017). In that case, PGE and a guarantor for a contractor, Abengoa S.A. ("Abengoa"), entered into a contract that contained a clause requiring arbitration under ICC rules. *Id.* at 984. After PGE and Abengoa commenced arbitration, Abengoa filed an impleader action against certain third parties (including bond sureties), seeking to bring those third parties into the arbitration. The sureties consented to arbitration. *Id.* PGE, however, objected, asserting that the sureties could not be part of the arbitration.

The Ninth Circuit noted that "PGE does not dispute the validity of the arbitration clause in the Guaranty, but rather only its scope—PGE claims that the impleader provision and its acceptance of the ICC procedural rules do not extend to the resolution of its dispute with the impleaded Sureties." *Id.* at 985. The Ninth Circuit concluded that although gateway issues of arbitrability are generally for the federal courts to decide, "parties may delegate the adjudication of gateway issues to the arbitrator if they 'clearly and unmistakably' agree to do so." *Id.* (quoting *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83-84 (2002)). The court held that because the ICC rules contain an express provision giving the arbitrator authority to rule on questions of arbitrability, contracts that incorporate the ICC rules constitute such a clear and unmistakable delegation of authority. *Id.* The Ninth Circuit rejected PGE's argument that the threshold question at issue in the case was whether there was a contract involving the *sureties* that required arbitration. Instead, the court concluded that the case involved "questions of the scope of the arbitration agreement in the Guaranty [with Abengoa], delegated to the arbitrators." *Id.* at 986.

DTS argues that *PGE* is persuasive authority for the circumstances between DTS and Meduri in this case based on the clear and unmistakable delegation to the ICC that is present in the 332 document from DTS dated August 24, 2015, which expressly incorporates the Orgalime Conditions and, thus, the rules of the ICC. DTS argues that *PGE* directs that the issue of arbitrability is for the ICC arbitrator to decide. DTS, however, is putting the cart before the horse.

The parties must first *clearly and unmistakably agree* to delegate issues of arbitrability for *PGE* to apply. If Meduri had conceded that the 332 document constitutes a binding contract between the parties, then DTS might have a persuasive argument that the parties had clearly and unmistakably agreed to delegate issues of arbitrability. Meduri asserts, however, that it rejected that offer by DTS and that it did not accept any offer by DTS until Meduri accepted the 355 document on September 19, 2015. Thus, only if the Court first concludes that the 332 document constitutes, or at least is part of, the operative contract agreed upon between the parties can the Court then find that the parties clearly and unmistakably agreed to delegate issues of arbitrability to the ICC arbitrator (or even to arbitrate at all). This is because the 355 document does not contain any provision incorporating the Orgalime Conditions, incorporating any portion of the 332 document, or even referring to any portion of the 332 document. *See Sanford v. MemberWorks, Inc.*, 483 F.3d 956, 962 (9th Cir. 2007) ("Issues regarding the *validity* or *enforcement* of a putative contract mandating arbitration should be referred to an arbitrator, but challenges to the *existence* of a contract as a whole must be determined by the court prior to ordering arbitration." (emphasis in original)); *see also Wiand v. Schneiderman*, 778 F.3d 917, 924 (11th Cir. 2015) (noting that challenges "to the very existence of the contract must be resolved by the court"); *Freaner v. Valle*, 966 F. Supp. 2d 1068, 1079 (S.D. Cal. 2013)

("Importantly, however, arguments that deny the very *existence* of a contract . . . are . . . unfit for arbitral resolution because it is virtually impossible to conceive how a party advancing such an argument could be said to have agreed to arbitrate the question of the arbitrator's jurisdiction. For this reason, a fundamental dispute regarding contract formation is presumptively for judicial resolution, absent other compelling reasons to allow the arbitrator to consider such a challenge." (emphasis in original) (quotation marks and citations omitted)). Accordingly, the Court begins its analysis by determining what constitutes the operative contract actually agreed upon between the parties.

## B. The Operative Contract(s) Between the Parties

### 1. Governing Law

As noted above, DTS argues that the state law of Oregon governs contract formation issues between the parties.[3] Meduri disagrees and argues that the CISG governs contract formation questions in this case because the contract concerns the international sale of goods and the contracting parties are both signatory countries.[4] Choice of law, however, ultimately does not matter in this case because under both Oregon law and the CISG, the 355 document is the binding and operative contract between the parties, and it does not contain an arbitration clause or incorporate or refer to any document that does. As discussed further below, the Court reaches this conclusion because as between merchants in a contract for the sale of goods, the

---

[3] *See Al Rushaid*, 757 F.3d at 419 (applying state law to determine if the parties to a contract for the sale of goods incorporated the Orgalime Conditions and agreed to arbitrate, without any discussion of the CISG or its applicability).

[4] *See Chateau des Charmes Wines Ltd. v. Sabate USA Inc*., 328 F.3d 528, 530 (9th Cir. 2003 (holding that the CISG, not state law, applies to interpret a contract for the sale of goods from a California company to a Canadian company). The full text of the CISG is available at https://treaties.un.org/doc/Publication/UNTS/Volume%201489/volume-1489-I-25567-English.pdf (last visited December 5, 2017).

requirements for an enforceable contract under both the Oregon UCC and the CISG require only minimal but essential contract terms. Although the common law may require more material terms in order to form a contract, the UCC and the CISG, in dealing with merchants, expressly provide that such sophisticated parties do not need to memorialize all the material terms in their contracts and can create enforceable contracts with only a few essential terms.

### 2. Agreement to Sell a Processing System

Meduri asserts that the offer it accepted was the one-page price overview, the 355 document sent by DTS on September 16, 2015. Both parties agree that Meduri's acceptance was in the form of an email dated September 19, 2015 from Mr. Meduri with the subject line "VF150355-Meduri Farms." DTS argues, however, that this acceptance necessarily had to be an acceptance of, and incorporation of the terms contained in, the 332 document sent on August 24, 2015, as modified by a series of communications between the parties that occurred between August 24, 2015 and September 19, 2015. DTS contends that the 355 document was meant only to serve as a replacement page for the one-page price overview contained on page 32 of the 332 document, to reflect the price reduction from two pieces of equipment to one piece. DTS further argues that the 332 document is the document that contains most of the technical specifications, although DTS concedes that some changes were made in the August 28, 2015 letter. Without the 332 document, DTS asks, how would Meduri know what it was buying? For example, how would Meduri know that the machine was going to process 5,000 pounds of fruit per hour? The 355 document contains no terms other than a very brief product description, quantity, and price. There are several flaws in DTS's argument, under both the Oregon UCC and the CISG.

Under the Oregon UCC's merchant exception, codified at Oregon Revised Statutes § 72.2010, to be enforceable, a contract for the sale of goods between merchants need only contain a term specifying the quantity of goods to be purchased and evidence that the contract is

for the sale of goods. Or. Rev. Stat. § 72.2010(1); *see also id.* UCC Comment 1 ("Only three definite and invariable requirements as to the memorandum are made by this subsection. First, it must evidence a contract for the sale of goods; second, it must be 'signed,' a word which includes any authentication which identifies the party to be charged; and third, it must specify a quantity."). Under the UCC, a contract for a sale of goods between merchants need not contain all material terms, and even the "price, time and place of payment or delivery, the general quality of the goods, or any particular warranties may all be omitted." *Id.* UCC Comment 1. Thus, the fact that the 355 document did not contain the technical specifications for the processing system does not make it an unenforceable contract for the sale of goods between merchants under Oregon law. Because the 355 document specified the quantity of goods to be purchased and because the agreement was a contract for the sale of goods between merchants, it complies with § 72.2010(1) and is an enforceable agreement.

Similarly, the CISG requires that a valid offer to contract for the sale of goods must be "sufficiently definite." CISG Article 14(1). "A proposal is sufficiently definite if it indicates the goods and expressly or implicitly fixes or makes provision for determining the quantity and the price." *Id.* The 355 document meets these requirements because it indicates the goods being sold (listing them all in a manner that the parties understood, as merchants in the industry who had been negotiating this deal for months), the quantity, and the price. To accept an offer under the CISG requires only a statement made or other conduct indicating assent. CISG Article 18(1).

Under both the CISG and the Oregon UCC, the 355 document was a valid offer by DTS to contract for the sale of goods between merchants. Mr. Meduri's email, specifically referencing the 355 document, indicates Meduri's intent to purchase the goods offered by DTS in that document. This email, plus Meduri's subsequent conduct in making the initial required payment,

constitutes Meduri's valid acceptance. Thus, under either the CISG or the Oregon UCC, the parties entered into a valid and enforceable contract, as described in the 355 document. That document, however, does not contain an arbitration clause or incorporate any document that does.[5]

DTS's argument that Meduri could not know what it was purchasing without the 332 document is unpersuasive. First, the 332 document is not rendered irrelevant to the parties' ultimate contract just because it is not part of the final written agreement between the parties. It becomes part of the parties' communications that can serve as evidence of the parties' understanding and intent regarding other material terms that were not part of the parties' contract. Considering such evidence is contemplated by the UCC and the CISG in allowing for merchants not to include all material terms in their contracts. *Cf.* Or. Rev. Stat. § 72.2010 UCC Comment 1 (noting that the factfinder can look to price lists and catalogues known to both parties to determine the material term of the price of the goods when that term is missing from the contract). Second, many of the material terms relating to the processing system, including the 5,000 pounds per hour amount, were included in other documents and communications besides the 332 document. For example the 5,000 pounds per hour processing amount was included in the 293 document, Meduri's Letter of Intent, and the cover letter that went along with 332 document. These documents, as well as the August 28, 2015 letter, also contained other

---

[5] DTS also argues that Meduri cannot disavow the 332 document because Meduri relies on that purported contract in Meduri's First Amended Complaint. This argument is without merit. Meduri merely references the 332 document as part of the background of the parties' relationship and to demonstrate DTS's knowledge of Meduri's needs with respect to its processing system. Meduri expressly alleges that the parties "later agreed" on the sale at issue. FAC ¶ 14. Referencing earlier correspondence before the alleged contract does not mean Meduri is alleging that all of the earlier correspondence is part of the alleged contract. Meduri also references DTS's 293 document, dated July 15, 2015, and Meduri's July 24, 2015 Letter of Intent, none of which DTS contends is part of the parties' operative contract. *See* FAC ¶ 12.

technical information that related to the ultimate system purchase. Thus, the 332 document was not the only available source of technical information such that Meduri would have "no idea" of what it was purchasing if the 332 document was not a source of information for the parties' ultimate agreement. But, as noted above, the 332 document is not rendered meaningless just because it is not the parties' final contract (just as DTS's 293 document, Meduri's Letter of Intent, and DTS's August 28th letter are not meaningless to the parties' understanding and intent relating to the final purchase).

There are other problems as well with DTS's argument that the 332 document is the parties' operative contract. First, several material terms contained in this document, or offer, were changed by the parties' oral communication on August 27, 2015, as reflected in DTS's written letter of August 28, 2015. As memorialized in the August 28th letter, the parties made certain technical changes, added a warranty provision, and changed the delivery date from April 2016 to June 2016. Thus, Meduri's discussion with DTS on August 27th in response to the 332 document, wherein these material changes were discussed (and memorialized in the August 28th letter), was a rejection of the August 24th offer under the CISG, even if both parties believed it was an acceptance of the August 24th offer with modifications. *See* CISG Article 19 (noting that a reply to an offer that purports to be an acceptance but contains material changes is a rejection and a counter-offer, and that material changes include time of delivery and extent of one party's liability to the other). Notably, however, it is clear that neither party believed the conversation was an acceptance of the August 24th offer, because the August 28th letter expressly states: "*If* we come to an agreement" then a DTS engineer will visit Meduri. ECF 21-5 at 2 (emphasis added).

The same issue arises with the price and quantity change in the 355 document from two machines to one machine. When Meduri called and informed DTS that Meduri no longer wanted two machines, Meduri could not have been accepting the 332 document because the material change in quantity and price made Meduri's response a rejection and counter-offer under the CISG. Thus, the 355 document was a new offer from DTS made after Meduri's rejection of the 332 document.

There are also problems with DTS's argument that the 332 document was an accepted offer under the Oregon UCC. Oregon requires a "definite and seasonable expression of acceptance," even if that acceptance includes additional or new terms (which DTS argues is what occurred here). Or. Rev. Stat. § 72.2070(1). The problem is that Meduri never gave a definite and seasonable expression of acceptance of the 332 document. The discussion on August 27th was not an acceptance of the 332 document, as evidenced by the August 28th letter setting forth new material terms and discussing what would happen *if* the parties reached a deal. Mr. Meduri's email of September 19, 2015, also is not a definite and seasonable expression of acceptance of the 332 document because it expressly references the 355 document. One would have to construe Mr. Meduri's reference to the 355 document in the subject line of his September 19, 2015 email to mean the 332 document, as modified by the August 28, 2015 letter, and as modified by the 355 document. This interpretation is simply not supported by Mr. Meduri's September 19, 2015 email. Thus, there is no definite and seasonable expression of acceptance by Meduri of the 332 document.

DTS argues that Meduri's acceptance included or incorporated the 332 document because if it did not, there would be no technical specifications included in the contract. As discussed

above, however, no technical specifications are needed in a contract for the sale of goods between merchants.

DTS also argues that Meduri's acceptance included the 332 document because Mr. Meduri expressly referenced a 10 percent deposit in his acceptance email, and the 355 document has no payment terms, whereas the 332 document includes a 10 percent deposit payment term. This argument is unpersuasive for several reasons. First, under the UCC and the CISG, the written contract does not need to contain all of the terms of the parties' agreement and expressly does not need to contain payment terms. Thus, Mr. Meduri's offer to pay a 10 percent deposit can be separate from the parties' written contract. Second, the parties could have agreed to continue the payment terms as originally set forth in the 332 document and simply not included that specific agreement in the 355 contract. Alternatively, the parties could be without agreement concerning payment terms, and Mr. Meduri could simply have been assuming that DTS would want a 10 percent deposit because that is what DTS had previously asked for in its earlier quote. Mr. Meduri's understanding that DTS generally operates on a 10 percent, 40 percent, 40 percent, and 10 percent payment plan, and Mr. Meduri's willingness to make an initial deposit based on that general payment plan does not mean that he was accepting all of the terms and conditions of the 332 document or incorporating the 332 document into his acceptance of the 355 document. The bottom line is that payment terms are not required to be part of a written contract, and the fact that Mr. Meduri expressed his intent to pay a 10 percent deposit in his email accepting the 355 contract does not negate his acceptance of a contract that did not contain payment terms or convert it into an acceptance of a completely different contract.

Moreover, this argument by DTS ignores the November 12, 2015, email from DTS to Meduri, in which DTS asks Meduri about setting up a payment plan. If DTS understood the

parties already to be bound under document 332, then DTS would not have needed to ask about a payment plan. The payment plan would have already been set up as a 10-40-40-10 payment plan, with specific triggering events for when each payment was due. Granted, Mr. Meduri's email response indicates that he reviewed the 332 document to see when he believed the next payment would be expected, but that does not mean that he necessarily thought the 332 document was the parties' operative contract. Also, Mr. Meduri referenced it as a "quote" and not a "contract." This could imply that he viewed it as a quote that previously was sent that included an example of how DTS generally sets up payment terms. He then asked if the payment terms could be set up differently than described in that example. Further, regardless of the meaning of Mr. Meduri's comment in November 2015, this email is insufficient evidence to show that the September 19, 2015 email was a definite and seasonable acceptance of the 332 document (as modified by the August 28, 2015 email and the 355 document).

The 355 document, VF150355, is the operative contract for the processing system purchased by Meduri from DTS. It does not contain a provision incorporating the Orgalime Conditions, either expressly or by incorporating any earlier document that contains that term. For a term as significant as mandatory arbitration (as a waiver of jury trial rights), if that is what DTS demands as condition for selling its goods, DTS needed to be more explicit in its contracting documents. Accordingly, the parties did not agree to arbitrate any dispute relating to the system purchase or installation.[6]

---

[6] Meduri also argues that the Orgalime Conditions cannot be part of the parties' contract because the Second Circuit has interpreted the text of the Convention on the Recognition and Enforcement of Foreign Arbitral Awards as narrowing the requirements of what it takes to create an enforceable and binding arbitration agreement. *See Kahn Lucas Lancaster, Inc. v. Lark In'l Ltd.*, 186 F.3d 210, 215-218 (2d Cir. 1999), *abrogated in part on other grounds by Sarhank Grp. v. Oracle Corp.*, 404 F.3d 657, 660 n.2 (2d Cir. 2005). In *Kahn*, interpreting the text of that particular Convention, the Second Circuit held that an arbitration agreement "whether it be an

### 3. Orders for Auxiliary Parts

DTS argues that even if the processing system contract does not contain an arbitration clause, Meduri is still bound to arbitrate the dispute over the purchase of three auxiliary parts. A review of the documentation for each purchase, however, demonstrates that this assertion is without merit.

### a. Test flume

The Order Confirmation from DTS for the test flume contained a clause stating that the Orgalime Conditions apply. There is no evidence before the Court, however, that this Order Confirmation reflects the agreement between the parties for the purchase of the test flume. There is no document or quotation from DTS containing the Orgalime Conditions that was expressly accepted by Meduri. Further, Mr. Meduri submitted a declaration stating that Orgalime Conditions and particularly international arbitration were never discussed with him and that he would not have agreed to such a condition. *See* ECF 21 at 3, ¶¶ 16, 18. Thus, the test flume Order Confirmation is a "written confirmation" that "states terms additional to or different from those agreed upon." Or. Rev. Stat. § 72.2070(1); *see also id.* UCC Comment 1 ("This section is intended to deal with two typical situations. The one is the written confirmation, where an agreement has been reached either orally or by informal correspondence between the parties and is followed by one or both of the parties sending formal memoranda embodying the terms so far as agreed upon and adding terms not discussed."). Under the Oregon UCC, such a written

---

arbitration agreement or an arbitral clause in a contract, [must] be signed by the parties or contained in a series of letters or telegrams." *Id.* at 215. Meduri argues that because it did not sign the 332 document and the parties did not exchange an agreement to arbitrate in a series of communications, there is no enforceable agreement to arbitrate. Because the Court finds that under the text of the CISG (and under the Oregon UCC) the 355 document is the parties' operative contract and does not incorporate by reference or include the 332 document or the Orgalime Conditions, the Court does not reach this argument.

confirmation is construed as a "proposal for addition to the contract." *Id.* § 72.2070(2). As between merchants, the new term becomes part of the contract unless the term—as relevant here—materially alters the contract. *Id.* § 72.2070(2)(b).

Whether a term materially alters a contract is primarily based on whether the term will result in surprise or hardship if incorporated without express awareness of the other party. Or. Rev. Stat. § 72.2070 UCC Comment 4. The UCC comments to § 72.2070 provide some examples of what may be considered terms that materially alter a contract, as well as examples of terms that would not materially alter a contract. Arbitration provisions are not included in either set of examples.

Before recent Supreme Court decisions holding that arbitration clauses cannot be treated differently than other clauses, courts generally found that arbitration clauses *per se* constituted a material alteration to a contract. *See* 2 Williston on Contracts § 6:22 (4th ed.). Now, courts engage in a case-by-case factual analysis to determine whether an arbitration provision would cause a hardship or unfair surprise in a particular case. *See, e.g.*, *REIS Robotics (China) Co. v. Miasole, Inc.*, 2017 WL 1196834, at *6 (N.D. Cal. Mar. 31, 2017). Often, "if the trade is one in which arbitration provisions are the norm, the provision" may end up being construed as part of the contract. 2 Williston on Contracts § 6:22.

DTS offers no evidence that ICC arbitration is commonplace in the industry of custom mechanical engineered parts sales. Nor does DTS offer evidence that arbitration was ever even discussed between the parties, such that it would not have been a surprise to Meduri to find the term included. To the contrary, as noted above, Mr. Meduri testified that arbitration was never discussed and he would not have agreed to it, particularly international arbitration under the ICC rules, which limit a purchaser's remedies. The mere fact that DTS had sent at least one other

document that referenced the Orgalime Conditions (the 332 document) is insufficient to make those conditions part of the parties' bargain through a previous course of dealing. It merely shows that DTS desired to have international arbitration included as part of the terms, but DTS had ample opportunity expressly to *negotiate* that as a term but failed (or chose not) to do so explicitly. *See, e.g.*, *Step-Saver Data Sys., Inc. v. Wyse Tech.*, 939 F.2d 91, 104 (3d Cir. 1991) (holding that "the repeated sending of a writing which contains certain standard terms, without any action with respect to the issues addressed by those terms, cannot constitute a course of dealing which would incorporate a term of the writing otherwise excluded under § 2-207" because the repeated sending of a particular form shows only that the party sending the form desires certain terms, and because sellers have every opportunity to negotiate the precise terms they seek, their failure to do so strongly suggests that those terms are not part of the parties' commercial bargain).[7]

Under the circumstances of this case, arbitrating before the ICC was a term that materially altered the contract for sale of the test flume under § 72.2070(2)(b). It was both a surprise and a hardship for Meduri. The analysis under the CISG is the same, except a term relating to the settlement of disputes (*e.g.*, arbitration) is specifically listed as a term that materially alters a contract. *See* CISG Article 19(3). Thus, the incorporation of the Orgalime

---

[7] Moreover, as of November 2015, at least based on the record before the Court, it appears that the test flume Order Confirmation is only the second document sent to Meduri that referenced the Orgalime Conditions. The sending of one previous document referencing the Orgalime conditions, however, does not qualify as a course of dealing even if repeatedly sending documents could constitute a course of dealing that would serve to negate surprise and hardship. *See Trans-Tec Asia v. M/V HARMONY CONTAINER*, 435 F. Supp. 2d 1015, 1028-29 (C.D. Cal. 2005), *aff'd*, 518 F.3d 1120 (9th Cir. 2008) ("Under well-established precedent, a single prior transaction cannot constitute a course of dealing within the meaning of the UCC.") (collecting cases).

Conditions, which was added to the test flume contract by DTS in its Contract Confirmation, is an additional term that did *not* become part of the contract under Oregon law and the CISG.

### b. Clamps and pressure transmitter

The quotations for both the clamps and the pressure transmitter did not reference or incorporate the Orgalime Conditions. Neither did the emails transmitting the quotations. The email transmitting the quotation for the pressure transmitter was silent regarding terms and conditions, although it attached a copy of the Orgalime Conditions along with the quotation. The email transmitting the quotation for the clamps and the email transmitting the order confirmation for the pressure transmitter attached copies of the Orgalime Conditions. The emails themselves, however, did not state that they were attaching any terms and conditions required to be part of the parties' contract. Indeed, the emails indicated just the opposite. They stated that "our terms and conditions" would apply to the contract (not the "Orgalime" terms and conditions) and that *if requested* "we will send you a copy of the general supply conditions" (again, not the "Orgalime" conditions). Thus, it is not a reasonable interpretation that the attached document, the Orgalime Conditions, was a necessary term of the parties' contract. Instead, it was reasonable for Meduri simply to assume that DTS had its own general supply conditions that would apply and that were available upon request.

Notably, Meduri did expressly accept both the quotation for the clamps and the quotation for the pressure transmitter, by return email. But again, because those quotations did not incorporate the Orgalime Conditions, Meduri was not accepting an offer that contained the Orgalime Conditions. Accordingly, the Orgalime Conditions are not a term in either the contract for the sale of the clamps or the pressure transmitter.

**C. Preliminary Injunction Factors**

Although some courts enjoin a party from pursuing arbitration as soon as the court determines that the parties have not entered into a contract that contains an arbitration clause, the Court will review the preliminary injunction factors, as suggested by *Textile Unlimited*, 240 F.3d at 786.

### 1. Likelihood of Success on the Merits

Because the Court has found that none of the contracts between the parties contain an arbitration clause, Meduri has succeeded on its argument that it is not bound by an arbitration clause. Thus, this factor supports an injunction.

### 2. Likelihood of Irreparable Harm

It does not appear that, after *Winter*, the Ninth Circuit has addressed the issue of irreparable harm in the context of a motion seeking a preliminary injunction to enjoin a party from continuing to pursue arbitration. In two cases that precede *Winter*, however, the Ninth Circuit indicated that irreparable injury presumptively exists if a party is required to participate in an arbitration in which it has not agreed to participate. *See Textile Unlimited*, 240 F.3d at 786 ("The district court found that Textile would suffer irreparable harm if the arbitration were not stayed, that the balance of hardships tipped in Textile's favor and that it was in the public interest to stay arbitration. These findings were not clearly erroneous."); *LAWI/CSA Consolidators, Inc. v. Wholesale & Retail Food Distrib., Teamsters Local 63*, 849 F.2d 1236, 1241 n.3 (9th Cir. 1988) ("Finally, Local 63 contends that declaratory and injunctive relief were inappropriate in this case because Consolidators did not show that further arbitration would have caused irreparable harm or that there was no adequate remedy at law. Consolidators was entitled to injunctive relief once it established that it was no longer under a contractual duty to arbitrate.").

Similarly, other courts (both before and after *Winter*) have held that "[f]orcing a party to submit to arbitration, when it did not agree to do so, constitutes *per se* irreparable harm." *Ingram Micro*, 2014 WL 3721197, at *4; *see also Merrill Lynch Inv. Managers v. Optibase, Ltd.*, 337 F.3d 125, 129 (2d Cir. 2003) (finding that a party would suffer irreparable harm if it had to "expend time and resources arbitrating an issue that is not arbitrable, and for which any award would not be enforceable" (quotation marks omitted); *Md. Cas. Co. v. Realty Advisory Bd. on Labor Relations*, 107 F.3d 979, 984-85 (2d Cir. 1997) (finding that time and resources spent in arbitration are not compensable by monetary award under the Arbitration Act); *PaineWebber, Inc. v. Hartman*, 921 F.2d 507, 515 (3d Cir. 1990) (holding that *per se* irreparable harm exists where an injunction was not entered prior to the court's determination of the arbitrability of plaintiff's claims); *Pension Plan for Pension Trust Fund for Operating Eng's v. Weldway Const., Inc.*, 920 F. Supp. 2d 1034, 1041, 1049 (N.D. Cal. 2013) (collecting cases).

The Court agrees with these courts and finds that Meduri likely would suffer irreparable harm if it were forced to submit to arbitration when it did not agree to do so. Such likely irreparable harm would be in the form of lost constitutional and other procedural rights. In addition, irreparable harm would also be found in the burdens and inconveniences of having to litigate in a foreign country and in a forum to which Meduri did not agree. Moreover, if Meduri tried to avoid those burdens and inconveniences by ignoring the arbitration, Meduri may suffer a loss in reputation if it were to have a judgment entered against it. Even if Meduri were to later succeed in having the judgment declared unenforceable (such as by succeeding on an argument under *Kahn*), this loss to reputation may not be fully recoverable.

### 3. Public interest

Although the public interest may support alternative dispute resolution, it does not support requiring a party to arbitrate when it has not agreed to do so. *See Comer v. Micor,*

*Inc.*, 436 F.3d 1098, 1104 n.11 (9th Cir. 2006) (declining to apply the liberal federal policy favoring arbitration when the question is whether a party is bound to arbitration instead of whether a particular issue or dispute is arbitrable). Requiring parties to give up their rights to a jury trial, civil discovery, and other procedural mechanisms without their consent is not in the public interest.

### 4.  Balancing of the equities

The balance of the equities similarly favors granting a preliminary injunction. Meduri should not be required to arbitrate this dispute and forfeit its constitutional and procedural rights when it did not agree to do so. Had DTS wanted to ensure ICC arbitration of any dispute that might arise with Meduri, DTS could have explicitly done so in a clear, unmistakable, effective, and enforceable way. It did not.

## CONCLUSION

Plaintiff Meduri Farms, Inc.'s Motion to Enjoin Arbitration (ECF 28) is GRANTED to the extent that Defendant DutchTecSource B.V. is hereby enjoined from continuing to proceed with arbitration against Meduri Farms, Inc. in the International Chamber of Commerce. Defendant's Motion to Refer Parties to Arbitration and Stay Proceedings (ECF 10) is DENIED. Within 14 days from the date of this Order, the parties shall confer regarding an appropriate case management schedule and file either a proposed stipulated schedule or each party's own proposed schedule.

**IT IS SO ORDERED**.

DATED this 5th day of December, 2017.

/s/ Michael H. Simon
Michael H. Simon
United States District Judge